IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RADEE PRINCE, | § | |
| | § | |
| Defendant Below, | § | No. 351, 2018 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 1710010993A |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: May 17, 2019
Decided: July 25, 2019

Before **STRINE**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

## <u>ORDER</u>

After consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1) In May 2018, a Superior Court jury found the defendant-appellant, Radee Prince, guilty of attempted manslaughter and other crimes arising out of a shooting in Wilmington. The Superior Court sentenced Prince to a total of forty years of unsuspended time in prison, followed by probation. This is Prince's direct appeal.

(2) The evidence presented at trial reflects that on October 18, 2017, Rashan Baul (also known as Jason Baul) was meeting with Cort Hughes at Baul's

auto-sales business when Prince entered the building, opened the door to the small office where Baul and Hughes were meeting, and shot Baul.

(3)    A bullet initially struck Baul in the face and lodged in his spine. Prince backed out of the office and stood outside the door, attempting to clear a jam in the gun. Baul struggled on the floor of the office, pushing the desk against the door. Prince then forcefully opened the door and fired again. Prince left the building, but then returned, pushed open the office door again, and fired again. At least one additional shot hit Baul and lodged in his pelvic area. As Baul and Prince struggled near the door to the office, Hughes managed to escape and fled the building. Prince then left the scene, saying "bleed out, bitch." Baul crawled to the door of the building and called for help. As his employees came to his aid, Baul reported that Prince, whom he had known for many years, was the shooter.

(4)    Ebony Wilson, one of Baul's employees, also identified Prince as the shooter. She had known Prince since childhood. On the morning of the shooting, Wilson was walking toward the building after collecting some information from cars on the lot when she saw Prince. They greeted each other by name, and Prince asked her if Baul was inside. She said that she did not know. Prince then entered the building, and Wilson saw him pull out a gun. She ran to warn another employee, and then heard a shot. She and the other employee fled. When Wilson saw a police car approaching, she ran back toward the building and saw Baul lying in the

2

doorway. Emergency personnel transported Baul to the hospital, where he was treated for his injuries and survived, although he required extensive follow-up treatment and suffered long-term effects from his wounds.

(5) Video footage from surveillance cameras located in and around the building also showed Prince arriving on the scene and shooting into the office. Other evidence confirmed that Prince drove from Maryland to Delaware shortly before the shooting, purchased ammunition from a Wal-Mart store, exchanged that ammunition for a different type, and then proceeded to Baul's auto lot.

(6) Prince did not contend at trial that he was not the shooter. Rather, his defense was that he had learned that Baul had hired someone to kill him, and that he therefore shot Baul in self-defense or under extreme emotional distress. The defense centered on evidence of a build-up of tension between Prince and Baul, beginning around the time that Baul testified in a criminal trial against Prince's brother, Aaron Bruton, who was also Baul's best friend. Prince testified that he had called Baul a rat, and that Baul had then hired some people to assault him outside of a nightclub, as a result of which Prince had a broken back and a severe laceration to his forehead, and was placed in a medically induced coma.

(7) Prince and Baul also testified about an incident that occurred in January 2016, after Bruton was released from prison. Bruton, Baul, and Prince were at the home of Prince's father, and Baul and Prince got into a fight. The testimony

3

regarding the reason for the fight and what happened next differed somewhat, but it is clear that at some point Baul and Prince left the house and Baul drove a truck into Prince. Baul was going to testify in a criminal case against Prince in connection with that incident, but the case was ultimately dismissed.

(8) Prince, his sister, his niece, and a family friend also testified that in May 2016, as Baul and Prince were leaving Prince's father's funeral, Baul took a gun out of the console of his car and aimed it at Prince's face. Baul denied having a gun at the funeral.

(9) Prince further testified that in 2016 he heard that Baul had offered $10,000 to have Prince killed. Prince said that he moved to Elkton, Maryland, so that Baul would not know where to find him. He testified that on the Saturday before the shooting, he saw someone who knew Baul standing outside a neighbor's house and became fearful that Baul would learn where he lived. He therefore decided to go to Baul's business to talk to him, but said that when he walked into the office, Baul reached toward his pocket—Prince believed to reach for a gun—and Prince opened fire.

(10) To rebut Prince's position that his past interactions with Baul supported a finding of self-defense or extreme emotional distress, the State sought to introduce evidence that on the morning of October 18, 2017, before going to Baul's business, Prince shot and killed three people and injured others at his workplace in Edgewood,

4

Maryland. The State argued that Prince had put his state of mind at issue, and that the probative value of the evidence of the Maryland shooting was sufficient to overcome its prejudicial nature. The Superior Court weighed the highly prejudicial nature of the evidence against its conclusion that the evidence was also highly probative of Prince's state of mind, and held that the evidence was admissible under D.R.E. 403.[1] The court also then performed an analysis under D.R.E. 404(b) and *Getz v. State*[2] and ruled that the evidence was admissible under that analysis as well.[3]

(11)   The State then questioned Prince about the Maryland shooting. Prince asserted his Fifth Amendment privilege. After the defense rested, the State introduced evidence of the Maryland shooting, including a video of the incident; the ensuing manhunt; and Prince's arrest later that evening in Newark, Delaware, by agents of the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"), which involved a brief foot chase during which Prince discarded a gun.

(12)   Several key instructions were given to the jury. First, the jury received an instruction on self-defense as to the attempted murder charge against Prince. Second, the court instructed the jury on the lesser-included offense of attempted manslaughter under extreme emotional distress. Finally, the court instructed the jury that it could use the evidence of the Maryland shooting only for the purpose of

---

[1] Transcript of Trial, May 14, 2018, at 147.
[2] 538 A.2d 726 (Del. 1988).
[3] Transcript of Trial, May 14, 2018, at 156-59.

5

determining Prince's state of mind as to the Baul shooting, and not for any other purpose.

(13) The jury found Prince not guilty of Attempted Murder and guilty of the lesser-included offense of Attempted Manslaughter Under Extreme Emotional Distress. The jury also found Prince guilty of Reckless Endangering First Degree, Carrying a Concealed Deadly Weapon, Resisting Arrest, and two counts of Possession of a Firearm During the Commission of a Felony.

(14) Appointed counsel represented Prince before and during trial. His trial counsel filed this appeal on his behalf. Prince then filed a motion and affidavit seeking to proceed *pro se* on appeal. This Court remanded to the Superior Court for a determination of whether Prince was making a knowing, intelligent, and voluntary waiver of his right to counsel on appeal. The Superior Court determined that he was, and this Court granted Prince's motion to proceed *pro se*.

(15) Prince has raised numerous issues for consideration by the Court. We address each of his arguments below.

### *Evidence of Prior Threats Against Baul and Dismissed Charges*

(16) Prince argues that the Superior Court erred by allowing the State to introduce, during its case in chief, testimony concerning: (i) threats that Prince had previously made against Baul;[4] and (ii) the charges against Prince, which were later

---

[4] Opening Brief at 21.

dismissed, arising out of the incident in which Baul ran into Prince with a truck.[5]

Prince did not object at trial to the introduction of this evidence,[6] and in fact his counsel elicited much of the testimony at issue.[7] We therefore review for plain error.[8] A plain error is one "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[9]

(17) We find no plain error arising from the introduction of this testimony. Evidence of other crimes or misconduct "is generally inadmissible to prove the commission of the offense charged."[10] "The general rule is intended to prevent the State from proving the charged offense by evidence of other crimes on the theory that the defendant acted in conformity with those other bad acts in committing the charged offense. Thus, the State cannot use another offense to establish that the defendant had a propensity to commit the charged offense."[11] But evidence of other crimes may be admitted for purposes other than proving propensity, including to

---

[5] Opening Brief at 21-22.

[6] Transcript of Trial, May 9, 2018, at 133-38, 144-66.

[7] *Id.* at 144-66.

[8] *See Stevenson v. State*, 149 A.3d 505, 509 (Del. 2016) (stating that if an objection was made at trial, "this Court reviews a trial court's ruling admitting or excluding evidence for abuse of discretion," and if no objection was made "this Court reviews an evidentiary issue only if the ruling constitutes plain error affecting substantial rights" (internal quotations omitted)).

[9] *Wilson v. State*, 950 A.2d 634, 641 (Del. 2008) (internal quotations omitted).

[10] *Deshields v. State*, 706 A.2d 502, 506 (Del. 1998).

[11] *Id.*

show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence

of mistake or accident.[12]

(18)   In *Getz v. State*, this Court established the following guidelines for trial

courts to apply when determining the admissibility of evidence under Rule 404(b):

> (i)     the evidence must be "material to an issue or ultimate fact in dispute in the case;"
> (ii)    the evidence must be introduced for a proper purpose, including those described in Rule 404(b)(2);
> (iii)   the other acts must be proved by plain, clear, and conclusive evidence;
> (iv)    the commission of the other acts "must not be too remote in time from the charged offense;"
> (v)     the court must "balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403;" and
> (vi)    the court should instruct the jury concerning the limited purpose for which the evidence is admitted.[13]

(19)   Prince argues that the evidence of the threats and dismissed charges was

not plain, clear, and conclusive because the only source of that evidence was Baul's

testimony.   But this Court has held that the testimony of a victim is sufficient to

satisfy the "plain, clear, and conclusive" standard of *Getz*.[14]   Here, the testimony

related to events in which Baul was involved, and the jury could evaluate his

---

[12] *Id.   See also* D.R.E. 404(b).

[13] 538 A.2d 726, 734 (Del. 1988).

[14] *Lloyd v. State*, 1991 WL 247737, at *3 (Del. Nov. 6, 1991).   *See also Campbell v. State*, 974 A.2d 156, 162-63 (Del. 2009) ("In *Lloyd*, we held that testimony sufficient to support an element of a crime must also be sufficient to show reliability under the 'plain, clear and conclusive' standard articulated in *Getz*.").

8

credibility. Prince's counsel had the opportunity to, and did, cross-examine Baul about his testimony and to present other witnesses or evidence rebutting that testimony. The testimony was therefore sufficiently plain, clear, and conclusive.[15]

(20)    Prince also contends that the evidence was not material to an issue in the case and was not introduced for a permissible purpose, and that the potential prejudice of the evidence outweighed its probative value. Thus, he contends it was plain error for the trial judge not to spontaneously intervene to keep the evidence out. We disagree that the trial judge committed any error. The evidence at issue included testimony concerning threatening words and conduct between Prince and Baul over a period of approximately two years before the shooting. That evidence was material to the issues of Prince's motive and intent when going to Baul's shop with a gun on the day of the shooting. Moreover, the defense strategy at trial was to suggest that a build-up of tension between Prince and Baul—culminating in Baul's allegedly soliciting a "hit" on Prince—caused Prince either to shoot Baul in self-defense or to experience extreme emotional distress that mitigated the shooting. That strategy explains why Prince's own counsel elicited much of the testimony at issue. Prince now complains that the trial judge did not intervene and essentially block the evidence most helpful to his own strategy—a strategy that appears to have had some success. In criminal trials, it is critical that the trial judge not impinge a

---

[15] *Campbell*, 974 A.2d at 162-63.

9

defendant's ability to present a defense by making rulings that are not requested and that might be inconsistent with the defense strategy.[16] Given that it was undisputed that Prince shot Baul, Prince's counsel pursued the only logical mitigating strategy, which was to present evidence justifying why Prince acted as he did. In light of those facts, there was no plain error as the evidence was probative of Prince's motive and state of mind, which are permissible purposes under Rule 404(b) and were at issue in the case, and the potential prejudice of the testimony did not outweigh its probative value.

(21) In situations where evidence of other misconduct is introduced over defense objections and is not itself inextricably intertwined with the defense's own strategy and evidence, *Getz* also requires a limiting instruction to the jury regarding the use of evidence admitted under Rule 404(b). In this case, the Superior Court did not give a limiting instruction as to the use of the evidence of the prior threats and dismissed charges, and the defense did not request an instruction. A trial court "generally does not commit plain error if it fails to give a limiting instruction, sua

---

[16] *See State v. Brower*, 971 A.2d 102, 108-09 (Del. 2009) ("Instructions on additional lesser-included offenses would have increased Brower's exposure to alternative convictions where he consistently argued that he was not criminally liable. Therefore, it would not have been proper for the trial court to contravene the defendant's strategy by giving the additional instruction *sua sponte*."); *Crawley v. State*, 2007 WL 1491448 (Del. May 23, 2007) (rejecting claim that, despite lack of objection from defense counsel at trial, the trial judge should have excluded evidence of prior bad acts, because defense counsel had made a tactical decision to use the evidence in a way that he thought would be to his client's advantage).

sponte, when evidence of prior bad acts is admitted."[17] The Superior Court's failure to give an instruction therefore did not constitute plain error, especially here where the evidence was in large measure introduced by Prince himself.

### *Evidence of Maryland Shooting*

(22) Prince's challenge to the Superior Court's decision to permit the State to introduce evidence of the Maryland shooting also implicates D.R.E. 403 and 404(b) and the *Getz* analysis.[18] Prince argues that the court should not have admitted the evidence because the defense did not put Prince's state of mind at issue and the prejudicial effect of the evidence outweighed its probative value.[19] Unlike his prior arguments about 404(b) evidence, these claims were properly preserved at trial. We therefore review for abuse of discretion.[20]

(23) During and after the close of the State's case-in-chief, the defense indicated that they would be seeking a self-defense instruction and an instruction on the lesser-included offense of attempted manslaughter under extreme emotional distress.[21] The Superior Court made a preliminary ruling that not enough evidence had been presented during the State's case-in-chief to support instructions on self-

---

[17] *Williams v. State*, 796 A.2d 1281, 1290 (Del. 2002).

[18] Opening Brief at 22-25.

[19] *Id.* at 22.

[20] *See Pope v. State*, 632 A.2d 73, 78-79 (Del. 1993) ("A trial court's admission of evidence pursuant to D.R.E. 403 and 404(b) will not be set aside by this Court unless the trial court has abused its discretion.").

[21] Transcript of Trial, May 10, 2018, at 60-76; 117-57.

defense and extreme emotional distress.[22] Defense counsel then indicated that Prince had decided to testify, in order "to explain to the Jury his state of mind on the 18th of October. And he would also like to explain to the Jury ['what happened in the interactions with him and Jason Baul'] that had created that state of mind."[23] The State argued that Prince's anticipated testimony would put his state of mind at issue, opening the door for the State to introduce evidence of the Maryland shooting. The court initially determined that Prince's testimony might "put the Maryland incidents in play" and engaged in a colloquy with Prince to ensure that he understood that risk.[24] Prince indicated that he understood and that he had decided to testify.

(24) Prince then took the stand. After Prince testified about his past interactions with Baul and that he feared that Baul had put a hit on his life, the State argued that his testimony had put his state of mind at issue, opening the door for the Maryland evidence.[25] Following extensive argument about the issues, the Superior Court ruled that, under D.R.E. 403, the evidence of the Maryland shooting was highly probative of his state of mind and the probative value outweighed the very prejudicial nature of the evidence.[26] The court also ruled that, applying D.R.E. 404(b) and the *Getz* analysis, the evidence was admissible because (i) it was highly

---

[22] Transcript of Trial, May 14, 2018, at 4-5.

[23] *Id.* at 5-6.

[24] *Id.* at 19-37.

[25] *Id.* at 129-30.

[26] *Id.* at 147-48.

material to intent and state of mind, which the defendant's testimony had made "the central issue of the case;" (ii) it was admitted for a permissible purpose under D.R.E. 404(b); (iii) the evidence was plain, clear, and conclusive, because there was a video of Prince engaging in the shooting in Maryland; (iv) it was not remote in time because it occurred the same day; (v) the probative value outweighed the prejudicial effect, for the reasons the court had discussed in its ruling under D.R.E. 403; and (vi) the jury would receive a limiting instruction.[27]

(25) We conclude that the Superior Court did not abuse its discretion. The Superior Court recognized the highly prejudicial nature of the evidence of the Maryland shooting.[28] But it determined that the fact that Prince had carried out a shooting in Maryland approximately two hours earlier was also highly probative of his state of mind when he shot Baul, in light of Prince's contention that he acted in self-defense or under extreme emotional distress because of his history with Baul over the past several years. When reaching that conclusion, the court carefully applied D.R.E. 403 and 404(b) to the facts, in accordance with the criteria set forth in *Getz*.[29] We therefore find no reversible error.[30]

---

[27] *Id.* at 156-59.

[28] *See, e.g.*, *id.* at 136 ("[S]o we are clear, three homicides two hours before this incident is about as prejudicial a piece of evidence as there is. I can't think of anything more prejudicial.").

[29] *Pope v. State*, 632 A.2d 73, 78-79 (Del. 1993).

[30] Despite the admission of the evidence, the jury *accepted* the claim that Prince was suffering from extreme emotional distress and found him guilty of the lesser-included offense of attempted manslaughter under extreme emotional distress. It therefore appears that Prince actually incurred no harm from the evidence.

## *Evidence of Job Dispute*

(26)   Prince also argues that the trial court erroneously admitted evidence that Prince was unhappy with Baul because Baul had refused to give him a job a few years before the shooting.   Prince contends that the evidence was inadmissible hearsay.[31]   Prince did not object to the testimony at trial.   He also does not identify what specific evidence relating to the job dispute purportedly was hearsay.  "Hearsay" is a statement made outside of court that is offered "to prove the truth of the matter asserted in the statement."[32]   Baul testified that Prince had tried to get a job at Baul's company three or four years before trial and that Baul had refused to hire him.[33]   That is a matter of which Baul had direct knowledge.  The fact that Prince disputes that version of events[34] does not make the testimony hearsay.  Moreover, to the extent Prince challenges Baul's testimony that, during a heated exchange between Prince and Baul in 2016, Prince asked Baul why Baul had not given him a job and said he was going to take everything Baul had,[35] we conclude that those statements did not constitute inadmissible hearsay because a statement made by a party—here, Prince—is not hearsay.[36]

---

[31] Opening Brief at 22.

[32] D.R.E. 801(c).

[33] Transcript of Trial, May 9, 2018, at 135.

[34] Transcript of Trial, May 14, 2018, at 95.

[35] Transcript of Trial, May 9, 2018, at 134.

[36] D.R.E. 801(d)(2).  *See also White v. State*, 2019 WL 719135, at *3 (Del. Feb. 19, 2019) (applying D.R.E. 801(d) and concluding that a statement made or adopted by a defendant "is

### *Damien Roberts's Invocation of the Fifth Amendment Privilege*

(27)   Next, Prince contends that the Superior Court erred by not allowing the defense to question Damien Roberts in front of the jury.[37]  Prince had identified Roberts as a witness, intending to elicit testimony that Baul had solicited Roberts to kill Prince.  At a sidebar conference, the State informed the Court that the State and Prince's counsel had spoken with Roberts's counsel, who had indicated that Roberts, if questioned, intended to invoke his Fifth Amendment privilege against self-incrimination.[38]  Roberts was then escorted into the courtroom and, outside the presence of the jury, the court informed him that the defense wanted to introduce evidence that Roberts was hired to kill someone and asked Roberts whether he would discuss that on the witness stand.  Roberts stated that he would not and that he would invoke his Fifth Amendment privilege.[39]  Prince's counsel then asked Roberts some questions about whether he had previously made statements about someone trying to hire him for a hit and whether he had been intimated or threatened about testifying, to which he responded that he had not.[40]  Roberts then left the courtroom and was not called to testify before the jury.

---

admissible as non-hearsay"); *Flonnory v. State*, 893 A.2d 507, 516 (Del. 2006) (holding that a statement by a defendant "is not hearsay").

[37] Opening Brief at 25.

[38] Transcript of Trial, May 14, 2018, at 188.

[39] *Id.* at 197-99.

[40] *Id.*at 199-203.

(28)   Prince does not cite any authority for the proposition that it is reversible error for a trial court to allow a potential witness to invoke the Fifth Amendment outside of the presence of the jury.  To the contrary, "[p]ermitting a witness to invoke the Fifth Amendment outside the presence of the jury does not violate the Constitutional rights of a criminal defendant."[41]

(29)   Prince also argues that the Superior Court's decision to have Roberts questioned outside the presence of the jury impinged on Prince's ability to show that the State intimidated Roberts into not testifying by transporting Roberts to the courthouse for an interview and telling him that he might be subject to criminal charges if he testified that he had a contract to kill Prince.

(30)   Prince did not raise this argument at trial, and we find no plain error for the following reasons.  First, because Prince never fairly raised the issue of tampering below, the trial judge obviously had no chance to address it, much less to address the argument that questioning Roberts outside the jury's presence somehow precluded the defense from exploring whether tampering occurred.  Second, even though the defense never argued the tampering claim below, the trial court in fact gave Prince's counsel the opportunity to question Roberts, and defense counsel used that opportunity to ask Roberts questions regarding the State's interaction with

---

[41] *Flonnory*, 893 A.2d at 535.  *See also Banther v. State*, 823 A.2d 467, 489 (Del. 2003) ("The trial judge correctly noted that [the defendant] had no right to have [a potential witness] assert his Fifth Amendment privilege before the jury.").

Roberts and his decision to invoke the Fifth Amendment. Finally, from the record of Robert's testimony, there is no basis to find that the Superior Court committed plain error by not spontaneously coming to the conclusion that the State had improperly tampered with Roberts. Rather, the record does not support Prince's claim that the State intimidated Roberts into not testifying. In response to the questions from Prince's counsel, Roberts said that on the previous Friday he had been transported to the courthouse, where three people, whose names and affiliations he could not remember, asked some questions about a hit on Prince. But he clearly stated that no one threatened or intimidated him about testifying or said that he had "better not testify," and he stated that he was invoking the Fifth Amendment solely because he did not want to incriminate himself, and not for any other reason.[42] No plain error arises when a prosecutor warns a prospective witness of the potential criminal consequences of his testimony, unless the prosecutor's conduct amounts to "a substantial interference with a witness's free and unhampered testimony."[43] "In fact, the government has an obligation to warn unrepresented witnesses of the risk that the testimony they are going to give can be used against them."[44] We therefore find no plain error.

---

[42] Transcript of Trial, May 14, 2018, at 202.

[43] *Torres v. State*, 979 a.2d 1087, 1095 (Del. 2009).

[44] *Id.* (quoting *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995)).

## *Failure to Sequester the Jurors*

(31)   Prince argues that the Superior Court erred by not sequestering the jury when the court sat in recess on the Friday, Saturday, and Sunday between the conclusion of the State's case-in-chief on Thursday October 10, 2018 and the beginning of the defense case on Monday October 14, 2018.[45]  As a general matter, this Court reviews a trial court's denial of a defendant's request for sequestration for abuse of discretion.[46]  Because Prince did not request sequestration or otherwise raise this claim below, we review for plain error.

(32)   Prince correctly observes that the Superior Court and the parties acknowledged that the shooting had received substantial pretrial coverage because of the Maryland shooting and ensuing manhunt.  But we find no plain error in the court's not sequestering the jury.  It is "well settled that jury sequestration is a matter of judicial discretion" and that "sequestration is a matter of discretion and not of fundamental or constitutional right."[47]  Moreover, "absent a showing of actual prejudice, a trial court's refusal to sequester a jury constitutes neither reversible error nor an abuse of discretion."[48]  "The fear of some media publicity during trial is seldom a sufficient reason for subjecting the jurors to the inconvenience of

---

[45] Opening Brief at 26.

[46] *Riley v. State*, 496 A.2d 997, 1013-14 (Del. 1985).

[47] *Id.* at 1015 (internal quotations and alterations omitted).

[48] *McBride v. State*, 477 A.2d 174, 193 (Del. 1984).

18

sequestration. Thus, the court must be notified of any offensive publicity before it can be required to take the necessary precaution of sequestering the jury. The defendant must be able to make a factual showing of actual prejudice resulting from inflammatory news reports during trial."[49]

(33) Prince has failed to make the necessary showing of actual prejudice. He correctly states that there was substantial pretrial publicity, but he argues only that the jury should have been sequestered during a three-day recess (including a weekend) in the middle of the trial. He does not contend that the jury should have been sequestered during the entire trial, and he does not he identify what, if any, media coverage occurred during the three-day recess. Nor did he make that showing to the Superior Court.[50] Moreover, the court had repeatedly instructed the jury not to partake of any news coverage or other discussion of the case, and until the three-day recess, the court and the parties had carefully avoided any references to the Maryland shooting. Thus, we see no additional prejudice that would have arisen during the recess, and conclude that the Superior Court adequately protected Prince's right to a fair trial by admonishing the jury to avoid media accounts of the trial.[51]

---

[49] *Id.* (citations and internal quotations omitted).

[50] *See id.* ("We find that defendant failed to direct the Court's attention to offensive publicity during trial sufficient to warrant implementation of the burdensome procedure of jury sequestration." (citation and internal quotation omitted)).

[51] *Id.*

19

### *Redacted Witness Statements and Protective Order*

(34) Prince also argues that the Superior Court erred by denying his request for nonredacted copies of police reports and witness statements.[52] The State agreed to provide the nonredacted documents to Prince's counsel, subject to a protective order that prevented his counsel from sharing witness-identifying information with Prince.[53] Prince wanted access to the complete information, but the court denied his request, stating that he did not have a general right to witness statements under Superior Court Criminal Rule 16 and that access to information beyond that required by the rules was subject to agreement between the State and the defense.[54] We review this issue for abuse of discretion.[55]

(35) Superior Court Criminal Rule 16 does not require the State to produce witness statements before trial or to provide a complete and detailed report of the police investigatory work performed on a case.[56] The Superior Court may enter protective orders that balance witness safety with a defendant's ability to prepare his defense.[57] In this case, the protective order limited disclosure to Prince only of

---

[52] Opening Brief at 27.

[53] Transcript of Suppression Hearing, Apr. 30, 2018, at 8-15.

[54] *Id.* at 13-15.

[55] *See Phillips v. State*, 154 A.3d 1146, 1155 (Del. 2017) ("This Court reviews 'a trial judge's application of the Superior Court Rules relating to discovery'—such as the protective orders at issue here—'for an abuse of discretion.'").

[56] *Id.*

[57] *Id.* at 1156.

witness-identifying information, not of the contents of the statements and reports, and Prince's counsel had full access to the information.[58]

(36) Of course, under *Brady v. Maryland,* "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."[59] But the duty to disclose exculpatory evidence "does not extend to the disclosure of material that is non-exculpatory."[60] In order to demonstrate a *Brady* violation, the defendant must establish three elements: the evidence is favorable to the accused because it is either exculpatory or impeaching; the State suppressed the evidence, either willfully or inadvertently; and the defendant was prejudiced.[61] Prince has not explained how any of the information that was withheld was favorable under *Brady*. Nor has he established that he was prejudiced by the withholding of the witness-identifying information from him, when he was represented by counsel at trial and his counsel had access to the information. The Superior Court did not abuse its discretion by

---

[58] *See id.* (holding that a protective order "struck a proper balance between witness safety and [defendant's] ability to prepare his defense" where "the witnesses' statements were disclosed well in advance of trial, their identities were revealed in advance of trial, and they were called to testify during trial, revealing their identities and the substance of their testimony, and subjecting them to cross-examination").

[59] 373 U.S. 83, 87 (1963).

[60] *Phillips*, 154 A.3d at 1155 (internal quotation omitted).

[61] *Goode v. State*, 136 A.3d 303, 312-13 (Del. 2016) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

entering the protective order in this case or by denying Prince's request for access to all the information his counsel had.

### *Failure to Suppress Evidence Obtained as a Result of Allegedly Illegal Arrest*

(37)  Prince also argues that the Superior Court erroneously denied Prince's motion to suppress the physical evidence, including the gun, that was seized in connection with his arrest.[62]  We review the Superior Court's decision to deny a motion to suppress for an abuse of discretion.[63]

(38)  Prince sought suppression on the basis that there was not probable cause for his arrest.[64]  The court held a suppression hearing, during which the State presented the testimony of a police detective concerning the "Be on the Lookout" ("BOLO") bulletin that Delaware-based law enforcement received after the Maryland shooting, which identified Prince and his vehicle; how law enforcement had identified Prince as the Delaware shooter, based on the video surveillance obtained from Baul's shop and Baul's identification of Prince as the shooter; the issuance of an additional BOLO bulletin; and the active search for Prince.  The detective also testified that ATF agents who were assisting with the search observed him in the area of Newark, Delaware, and recognized him as the wanted person.  The ATF agents attempted to approach Prince, leading to a brief foot chase, during which

---

[62] Opening Brief at 27-28.

[63] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284 (Del. 2008).

[64] *See* Transcript of Suppression Hearing, Apr. 30, 2018, at 17.

Prince discarded a firearm.[65]  The Superior Court denied the motion to suppress, finding "ample probable cause to take the defendant into custody, both on the basis of the Maryland BOLO and the evidence provided directly by the victim of the shooting."[66]

(39)  A police officer has probable cause to arrest a person if the "officer possesses information which would warrant a reasonable man in believing that a crime has been committed."[67]  The Superior Court found that the ATF agents had probable cause to arrest Prince, and we agree.  Baul had identified Prince, by name, as the shooter; the Maryland BOLO had identified Prince by name and photo; and the detective testified that everyone involved in the search for Prince had a photo of him.  After the ATF agents attempted to approach Prince, he ran, discarding the gun.  Given all of these circumstances, it was reasonable for the agents to believe that Prince was involved in the shooting, and they had probable cause to place him under arrest.  The Superior Court did not abuse its discretion by denying the motion to suppress.[68]

---

[65] *Id.* at 18-30.

[66] *Id.* at 32.

[67] *Clay v. State*, 164 A.3d 907, 916 (Del. 2017) (internal quotations omitted).

[68] *See id.* (holding that officer had probable cause to arrest the defendant because he observed the defendant with a man who matched the description of the robbery suspect, and after a lawful encounter with the officer, the defendant ran and appeared to throw an object over a fence).

## *Delayed Arraignment*

(40) Prince contends that the Superior Court should have dismissed his indictment because he was not arraigned until approximately four months after he was indicted.[69] After his initial arraignment was postponed because the Department of Correction did not transport him to court, his arraignment was scheduled for the same date as his first case review. The arraignment and first case review were then postponed twice at the request of the defense. Prince cites no authority for the proposition that a four-month delay between indictment and arraignment is fatal to an indictment or conviction, and we find no error, particularly where the delay was at least partially attributable to the defense.[70]

## *Attempted Manslaughter Under Extreme Emotional Distress*

(41) Next, Prince claims that Attempted Manslaughter Under Extreme Emotional Distress is not a cognizable crime and that the sentence imposed for his attempted manslaughter conviction exceeds the legal limit.[71] These claims are without merit.

(42) Citing *Rambo v. State*,[72] Prince argues that Attempted Manslaughter Under Extreme Emotional Distress "is not a recognized offense in Delaware"

---

[69] Opening Brief at 26, 28.
[70] *See generally* DEL. SUPER. CT. CRIM. R. 10 (establishing no time limitation for arraignment).
[71] Opening Brief at 29-31.
[72] 939 A.2d 1275 (Del. 2007).

24

because "the victim is still alive and there is nothing under [11 *Del. C.* § 632] which states Attempted Manslaughter is in use if the victim is still alive."[73] In *Rambo*, this Court held that "Delaware does not recognize attempted felony murder as a crime" because "[a]ttempt requires intent and . . . one cannot be convicted of an attempt to commit a crime which may only be committed recklessly."[74] Prince was convicted of attempted manslaughter under 11 *Del. C.* § 632(3). In contrast to the felony murder charge at issue in *Rambo*, intent is an element of the attempted manslaughter charge of which Prince was convicted, because Section 632(3) provides that a defendant is guilty of manslaughter when "the person *intentionally* causes the death of another person under circumstances which do not constitute murder because the person acts under the influence of extreme emotional disturbance."[75] *Rambo* is therefore inapposite, and Prince could properly be convicted of attempted manslaughter because he intentionally engaged in conduct—repeatedly shooting Baul, including in the face—which was a substantial step in committing manslaughter, and only did not constitute manslaughter because Baul did not die.[76]

---

[73] Opening Brief at 30.

[74] *Rambo*, 939 A.2d at 1277, 1281 (internal quotations omitted).

[75] 11 *Del. C.* § 632(3) (emphasis added). *See also id.* § 641 ("The fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree as defined by § 636 of this title to the crime of manslaughter as defined by § 632 of this title. . . .").

[76] *See* 11 *Del. C.* § 531(2) ("A person is guilty of an attempt to commit a crime if the person . . . (2) Intentionally does or omits to do anything which, under the circumstances as the person believes them to be, is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person.").

(43) Citing *State v. Magner*,[77] Prince also argues that a conviction for manslaughter carries a maximum sentence of ten years in prison. Prince is incorrect, because amendments to the criminal code in 2003—after *Magner* and before the incident at issue in this case—reclassified manslaughter from a class C to a class B felony and raised the maximum sentence for a class B felony from twenty to twenty-five years.[78]

(44) Finally, Prince argues that he cannot be separately sentenced for Attempted Manslaughter and for Possession of a Firearm During Commission of a Felony.[79] This claim is without merit. This Court has repeatedly held that a defendant may be convicted of and sentenced for both an underlying felony, such as attempted manslaughter, and a companion charge of possessing a firearm during the commission of that felony if, like here, the weapons offense and the underlying felony have at least one different element.[80]

---

[77] 732 A.2d 234 (Del. Super. Ct. 1997).

[78] *See* 2003 Del. Laws Ch. 106, §§ 2, 9 (H.B. 210) (2003) (amending 11 *Del. C.* § 632 and 11 *Del. C.* § 4205(b)(2)). *See also* 11 *Del. C.* § 632 (providing that manslaughter is a class B felony); *id.* § 4205(b)(2) (providing that the term of incarceration for a class B felony is "not less than 2 years up to 25 years").

[79] Opening Brief at 31.

[80] *See, e.g.*, *DeJesus v. State*, 2012 WL 689168 (Del. Mar. 1, 2012) (rejecting double jeopardy claim and holding that defendant could be sentenced for Aggravated Menacing and Unlawful Imprisonment First Degree, as well as "two related companion counts of PFDCF"). *Cf. also Robertson v. State*, 630 A.2d 1084, 1093 (Del. 1983) (holding that a defendant may be convicted of "separate convictions for a deadly weapon offense, for each felony the defendant committed while in possession of a deadly weapon").

## *Prosecutorial Misconduct*

(45) Prince also contends that the prosecutor engaged in misconduct.[81] Specifically, Prince claims that the prosecutor (i) knowingly presented perjured testimony; (ii) made statements during opening arguments that were not supported by the evidence; (iii) engaged in improper vouching; (iv) tampered with two of Prince's prospective witnesses; (v) failed to disclose that Baul was a confidential informant; and (vi) introduced inadmissible evidence, including hearsay, evidence of other bad acts and dismissed charges, and evidence of the Maryland shooting.

(46) Because Prince did not make these objections to the Superior Court, we review for plain error.[82] When reviewing a prosecutorial misconduct claim for plain error, we first review the record *de novo* to determine whether misconduct occurred.[83] If we determine that no misconduct occurred, our analysis ends. If we find misconduct, then the error must be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[84] "Plain error review is limited to material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[85]

---

[81] Opening Brief at 3.
[82] *Kirkley v. State*, 41 A.3d 372, 376 (Del. 2012).
[83] *Abbatiello v. State*, 2017 WL 3725063, at *2 (Del. Aug. 29, 2017).
[84] *Id.* (internal quotations omitted).
[85] *Id.* (internal quotation omitted).

27

(47) First, Prince argues that the prosecutor engaged in misconduct by allowing Baul to give false testimony. He contends that Baul testified falsely about the history of disputes between Prince and Baul, lied about having rejected Prince for a job, and falsely denied having hired anyone to assault or kill Prince. Prince's claim that Baul's testimony was false is based on the fact that Baul's version of events differed from his own or was inconsistent with or contradicted by the testimony of other witnesses.

(48) We conclude that Prince has not sufficiently established that Baul gave false testimony or that the State knowingly suborned perjury. That Prince disagrees with Baul's version of events does not make him correct; trials commonly involve witnesses with different views about events. Prince has accused a prosecutor of wrongdoing solely because Prince does not like what Baul said at trial. This comes nowhere close to showing that the prosecutor knew Baul's testimony was false. Furthermore, to the extent that there was inconsistency in the testimony or the testimony conflicted with Prince's version of events, his counsel conducted cross-examination in an effort to undermine the State's witnesses' credibility and called witnesses to tell Prince's version of events. It "was within the province of the jury

to assess the witnesses' credibility and to determine whether any inconsistencies created a reasonable doubt as to [Prince's] guilt."[86]

(49)  Second, Prince asserts that the prosecutor incorrectly stated during opening arguments that Prince threatened Baul at two different parties before the shooting.[87]  During his opening argument, the prosecutor stated that Baul and Prince "were at a private party at one point, words were exchanged.  They were at a public bar, Firestone at the Riverfront at one point, and words were exchanged."[88]  Prince contends that this statement constituted prosecutorial misconduct because Baul testified that although he had seen Prince at a private party and at Firestone, they did not exchange words at those events,[89] and no other witness testified that Baul and Prince exchanged words at a private party or at Firestone.

(50)  We conclude that the prosecutor's statement was not supported by the evidence at trial, but we find no substantial prejudice warranting reversal.  Prince himself submitted evidence that Prince and Baul had a history of conflict, and the State introduced evidence of other, more substantial encounters between Prince and Baul.  Moreover, the statement that "words were exchanged" does not even suggest

---

[86] *Crump v. State*, 2019 WL 494933, at *4 (Del. Feb. 7, 2019).  *See also McCloskey v. State*, 2009 WL 188857, at *2 (Del. Jan. 27, 2009) ("Scott's testimony at the two trials was not entirely consistent, and McCloskey explored the inconsistencies in an effort to undermine Scott's credibility.  But there is nothing in this record to suggest that the State acted improperly in calling Scott as a witness or in eliciting any of his testimony.").

[87] Opening Brief at 14.

[88] Transcript of Trial, May 8, 2018, at 116-17.

[89] Transcript of Trial, May 9, 2018, at 131-32.

29

that Prince was the aggressor—that statement could just as well support the theory put forward by the defense that Prince feared that Baul was trying to kill him.

(51) Third, Prince argues that the State improperly vouched for witnesses or stated personal opinions about the evidence. We disagree. During closing arguments, the prosecutor asked the jury to consider the evidence presented about the alleged hit and "ask yourselves is that something that was conjured up after the fact conveniently by his roommate in prison."[90] We conclude that this did not constitute prosecutorial misconduct, because the prosecutor merely made a statement that suggested a legitimate inference from the record evidence.[91] Prince testified that he believed that Baul had hired someone to kill him, but the only other witness who provided direct evidence about the alleged hit—testimony that he had overheard a conversation in which Baul said that he was trying to find someone to kill Prince in exchange for $10,000—had been housed in a cell near Prince's before trial. The prosecutor did not express a personal opinion about the credibility of the hit-man story and did not engage in misconduct by asking the jury to think about that issue. Moreover, we find no prejudice from the statement. Prince presented the hit-man theory as a basis for a finding of extreme emotional distress, and the jury in

---

[90] Opening Brief at 17. *See also id.* at 15 (discussing questioning suggesting that Prince had invented the hit-man theory).

[91] *See Wynn v. State*, 93 A.3d 638, 641 (Del. 2014) ("Because the prosecutor's statement is a legitimate inference supported by the record, it did not constitute misconduct.").

30

fact found that Prince acted under extreme emotional distress and therefore convicted him of the lesser-included offense of attempted manslaughter.

(52) Similarly, Prince seems to suggest that the prosecutor engaged in improper vouching by quoting the testimony of certain witnesses during closing arguments.[92] Reminding the jury of the evidence presented, as the prosecutor did here, without implying that the prosecutor possesses knowledge beyond the evidence presented at trial, is proper and therefore does not constitute prosecutorial misconduct.[93]

(53) Fourth, Prince claims that the prosecution or law enforcement officers tampered with two of Prince's witnesses, Damien Roberts and LaKendra Harris.[94] Prince asserts that an ATF agent contacted Harris, Prince's fiancée, "trying to discourage her from testifying." But the document that Prince has submitted in support of his claim—which was not in the record before the Superior Court— reflects only a cordial, professional message inviting Harris to call "if you change your mind and want to talk with me." In addition, Harris did in fact testify on Prince's behalf, answering all the questions posed to her.[95] Thus, Prince's claim is not supported by the record. Moreover, there is no general rule prohibiting the State

---

[92] *See* Opening Brief at 17 (quoting prosecutor's statements that Baul had said to Prince, "Man I'm sick of you" and that during the shooting Prince had told Baul and Hughes not to move).
[93] *Scott v. State*, 7 A.3d 471, 480 (Del. 2010); *Torres v. State*, 979 A.2d 1087, 1096 (Del. 2009).
[94] Opening Brief at 9.
[95] Transcript of Trial, May 14, 2018, at 182-86.

from contacting potential witnesses, even those who might be affiliated with the defendant, in connection with its investigation of a case or to prepare for trial. For these reasons and those discussed above relating to Damien Roberts, we find no merit to Prince's claims of witness tampering.

(54) Fifth, Prince also asserts that the prosecutor engaged in misconduct because Baul was an undercover informant for the police, and that relationship was not disclosed to the defense.[96] Prince's speculative allegations, supported only by testimony during trial that Baul and police officers who patrolled the area near his auto lot knew one another, do not provide a basis for concluding that Baul was an undercover informant. Moreover, even if Baul did ever act as a confidential informant, that has no bearing here, because as the victim in this case, Baul's identity was clearly disclosed to Prince.[97]

(55) Finally, Prince contends that the prosecutor engaged in misconduct by presenting various types of inadmissible evidence. For example, he argues that the State's sentencing memorandum included inadmissible information, including that he had been arrested in Maryland with a firearm in 2015 and that he had visited a former place of employment between the Maryland shooting and the Baul

---

[96] Opening Brief at 9.

[97] *See generally Horsey v. State*, 2006 WL 196438, at *2 (Del. Jan. 24, 2006) (discussing circumstances under which identity of confidential informant must be disclosed to defendant).

shooting.[98]   This information was not presented to the jury at trial, but only at sentencing.   At sentencing, a trial court may consider "unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance."[99]   In the sentencing context, the court may consider information about other, unproven crimes or conduct for which the defendant was not convicted, as long as the information presented does not lack minimal indicia of reliability.[100]   Prince has not demonstrated that the information submitted by the State in connection with sentencing lacked minimal indicia of reliability.

(56)   Prince's remaining claims that the prosecutor engaged in misconduct by introducing purportedly inadmissible evidence are frivolous and essentially repackage his arguments regarding the admissibility of that evidence, which we have already addressed above.   We find no additional merit to the claims when they are evaluated as claims of prosecutorial misconduct, because a prosecutor does not commit misconduct by seeking to introduce evidence in good faith, merely because that evidence might be subject to objection.[101]   The State has a right to present its

---

[98] Opening Brief at 10-12.

[99] *Mayes v. State*, 604 A.2d 839, 844-45 (Del. 1992) (internal quotation omitted).

[100] *Id.* at 843-45.

[101] *See, e.g.*, *Rainford v. State*, 2016 WL 6803773, at *4 (Del. Nov. 16, 2016) (stating that a prosecutor may not discuss evidence that he does not have a "good faith and reasonable basis to believe will be tendered and admitted in evidence" and holding that the prosecutor had a good faith belief that evidence of the defendant's involvement in drug activity would be admitted, particularly because the evidence was actually admitted); *Mathis v. State*, 2006 WL 2434741, at *3 (Del. Aug. 21, 2006) ("Where the [prosecutor's] alleged improper comments do not implicate credibility

case, and Prince's accusation that a prosecutor engaged in "misconduct" by openly presenting evidence in a context where the defense had every opportunity to object is itself improper. In any event, the evidence here was found to be admissible; thus, Prince cannot put forth a valid claim that the prosecutor acted improperly by introducing the evidence.[102]

### *Cumulative Error*

(57)   Finally, Prince claims that the alleged errors cumulatively resulted in an unfair trial.[103]  When there are multiple errors in a trial, this Court weighs their cumulative effect to determine if, combined, they are "prejudicial to substantial rights so as to jeopardize the fairness and integrity of the trial process."[104]  Because all of Prince's assignments of error are without merit, his claim of cumulative error also fails.[105]

---

issues, this Court must determine whether the prosecutor, in referencing evidence he intends to offer, believed in good faith it would be both available and admissible.").

[102] *See, e.g.*, *Henry v. State*, 2007 WL 637205, at *1 (Del. Mar. 2, 2007) ("After the trial court ruled that the evidence was admissible, the prosecutor did what the court allowed by eliciting the 'high crime area' testimony. It is hard to imagine how a prosecutor who follows the court's ruling could be found to have engaged in prosecutorial misconduct."); *Hubbard v. State*, 2001 WL 1089664, at *8 (Del. Sept. 5, 2001) ("Consequently, because we find that [a witness's] prior out of court statements were properly admitted into evidence, we find no merit to [the defendant's] contention that the prosecutor engaged in misconduct by referring to [the witness's] prior out of court statements in her opening statement.").

[103] Opening Brief at 32.

[104] *Johnson v. State*, 2015 WL 8528889, at *3 (Del. Dec. 10, 2015) (internal quotations and alteration omitted).

[105] *Id.*

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.

BY THE COURT:

*/s/ Leo E. Strine, Jr.*

Chief Justice